**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LAILA LOE, a minor, by her parent and next friend, LENA LOE,

Plaintiff,

v.

DISTRICT OF COLUMBIA,

KRISTINA KELLOGG, in her individual capacity,

MICHAEL ALFORD, in his individual capacity, and

NICOLE JENNINGS, in her individual capacity,

Defendants.

Civ. Action No. 26-3781

**COMPLAINT**

Jury Trial Demanded

## INTRODUCTION

1. Plaintiff Laila Loe[1] ("Plaintiff" or "Laila"), a minor, brings this civil rights lawsuit through her mother and next friend, Lena Loe ("Ms. Loe"), against Defendants District of Columbia (the "District"), and Kristina Kellogg, Michael Alford, and Nicole Jennings, in their individual capacities (the "Individual Defendants"), for ignoring and failing to address over a year of severe, pervasive verbal and physical peer-on-peer harassment Laila suffered as an elementary school student at Langley Elementary School ("Langley"), a public elementary school in the District of Columbia Public Schools ("DCPS"), targeting her for her Asian race and Uzbek national

[1] Laila and Lena Loe are pseudonyms used in this Complaint to protect Plaintiff's privacy. Plaintiff will concurrently file a motion to proceed pseudonymously.

origin. This unchecked discriminatory harassment became so unbearable that Ms. Loe was forced to withdraw Laila from public school in 2024.

2. Laila, who is now twelve years old, attended Langley from 2017 to 2024. During her time at Langley, Laila was one of very few Asian students at the school and often the only Asian student in her class.

3. For most of her last year at Langley, when she was in the fourth grade, then nine-year-old Laila was severely and persistently racially harassed, bullied, and physically intimidated by her classmates. They regularly taunted Laila with racial slurs such as "Ching Chong," told her that "Asians are disgusting and ugly," made "slanted eye" gestures at her, teased her in made-up "Chinese," and tripped her. These attacks happened in classrooms, at recess, in hallways, and sometimes in the presence of school staff.

4. Both Laila and her mother, as well as teachers and other school personnel, reported these incidents to Langley's principal, Defendant Kristina Kellogg, and the school's designated bullying prevention specialists, Defendants Michael Alford and Nicole Jennings, who refused to take action to stop the harassment or address the adverse educational, physical health, and mental health consequences Laila experienced as a result of the racially hostile environment at school caused by the chronic harassment.

5. Ms. Loe begged Defendants Kellogg, Alford, and Jennings, to take action to put a stop to the harassment and address the adverse effects on Laila resulting from the hostile learning environment resulting from this harassment. Despite Ms. Loe's repeated reports of the harassment and attempts to seek help for Laila, the school allowed the harassment to continue unchecked.

6. The hostile environment caused by the persistent racial harassment Laila experienced, and Defendants' inaction, caused Laila to fear going to school, to lose the opportunity

to attend school free of worries that she would be verbally or physically targeted for being Asian, and to experience adverse physical and mental health consequences. In response to the harassment, Laila experienced severe and worsening panic attacks before school, feelings of self-hatred, embarrassment about her own race and national origin, suicidal ideation, and other physical symptoms. Ms. Loe reported to the Individual Defendants and other school staff that Laila was afraid to come to school and had stated that she wanted to end her own life.

7. Defendants failed to meaningfully respond to the known harassment Laila was experiencing or to Ms. Loe's repeated reports seeking the school's intervention. Defendants repeatedly ignored reports from Ms. Loe and Langley staff, did not appropriately record the discriminatory incidents, failed to discipline the perpetrators, and dismissed the incidents as "kids being kids." Defendant Kellogg, the school principal, shockingly told Ms. Loe that there was nothing she could do to control the behavior of the students at Langley, and took no action even after Ms. Loe told Defendant Kellogg that she felt she had no choice but to withdraw Laila from school to protect her.

8. In the face of Defendants' inaction to known racial and national origin harassment, Laila continued to suffer worsening verbal and physical harassment targeting her for being Asian. As a result, she experienced severe emotional distress, mental anguish, suicidal ideation, and other harms, depriving her of equal access to the educational opportunities afforded to other students at Langley. This left Ms. Loe with no choice but to withdraw Laila from Langley in April 2024. "As long as I am alive," she wrote to Defendants, Laila "will not be another sad statistic."

9. In May 2024, the District of Columbia Office of Human Rights ("OHR")'s Youth Bullying Prevention Program found that Langley administrators and staff failed to comply with

D.C.'s Youth Bullying Prevention Act by failing to properly investigate the reports of harassment and failing to report back to Ms. Loe.

10. In July 2024, DCPS's Comprehensive Alternative Resolution & Equity Team ("DCPS CARE" or "DCPS CARE Team"), which was not made aware of the harassment until after Laila had withdrawn—in violation of DCPS policy—found that it is more likely than not that other Langley students harassed Laila on the basis of her race and that Langley administrators and staff failed to follow the proper protocols in the face of actual knowledge of the harassment.

11. Laila's experiences at Langley were so traumatic that she was too afraid to attend another DCPS school because she feared being harassed there, too, and she refused to return to school. Ms. Loe, who as a single mother and immigrant had worked hard to make a home for her family in the United States, ultimately and reluctantly decided to send her daughter to live with her grandparents in Uzbekistan.

12. Although Ms. Loe intended for Laila's time in Uzbekistan to be temporary, Laila has thrived there. Since moving to Uzbekistan, Laila informed Ms. Loe that she now feels "normal" and accepted and that she no longer sees herself as an "ugly, disgusting Ching Chong." Because Laila now attends a school where she is doing well and free from harassment, Ms. Loe is reluctant to bring her back to the United States for fear of further disruptions to Laila's education.

13. Ms. Loe is unable to take time off work to visit Uzbekistan because her income supports both Laila and her grandparents. As a result, Ms. Loe has not seen her only child in more than two and a half years. This separation has taken an extreme emotional toll on both Laila and her mother.

14. Defendants discriminated against Laila based on her race and national origin by failing to adequately respond to the allegations of discriminatory harassment, failing to respond to

the allegations of discrimination targeting Laila in the same manner as it responds to allegations of discrimination targeting non-Asian students, willfully failing to follow the proper reporting procedures, and failing to train administrators and staff on legally mandated procedures to report, investigate, and respond to bias-motivated harassment in DCPS schools.

15. Plaintiff brings this civil rights action against Defendant for violating her right to be free from race and national origin discrimination in school. Plaintiff asserts claims under (1) Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d (against the District), (2) 42 U.S.C. § 1983, for deprivation of her rights under the Equal Protection Clause of the Fifth Amendment to the United States Constitution (against all Defendants), and (3) the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2–1402.41, 2–1402.62 (against all Defendants).

16. Through this action, Plaintiff seeks (1) compensatory damages for emotional distress caused by the unchecked discriminatory harassment, her separation from her mother during formative childhood years, her loss of educational benefits, and other injuries arising out of Defendants' conduct; (2) punitive damages in an amount sufficient to deter future discriminatory conduct; (3) reasonable attorneys' fees and costs (including expert witness fees); and (4) such other relief as this Court deems just and equitable.

**PARTIES**

17. Plaintiff Laila Loe is a twelve-year-old girl. Laila was a student at Langley Elementary School, a DCPS public school, from approximately 2017 to 2024. Laila currently resides in Uzbekistan.

18. Plaintiff brings this action by and through her mother, Lena Loe. At all times relevant to this Complaint, Ms. Loe lived with her daughter, Plaintiff Laila Loe, in Washington, D.C. Ms. Loe currently resides in Montgomery County, Maryland.

19. Defendant District of Columbia is a municipal corporation and the local government of Washington, D.C. It is the governmental entity that maintains the District of Columbia Public Schools ("DCPS"), the public school system of the District of Columbia. DCPS is a common school system that operates under the direction of the Mayor of the District of Columbia. D.C. Code § 38–172. The mayor has authority over operations, functions, and education-related matters within the school system. *Id.* DCPS serves approximately 52,000 students in preschool ("Pre-K") through 12th grade who reside in the District.[2] The District of Columbia is a recipient of federal financial assistance within the meaning of 42 U.S.C. § 2000d and a "person" within the meaning of 42 U.S.C. § 1983.

20. Defendant Kristina Kellogg is sued in her individual capacity. At all times relevant to this Complaint, Defendant Kellogg was the Principal of Langley Elementary School, a DCPS public school. Defendant Kellogg is currently the Assistant Principal of Horace Mann Elementary School, another DCPS public school. At all relevant times, Defendant Kellogg acted under color of law within the scope and course of her employment by the District.

21. Defendant Michael Alford is sued in his individual capacity. Defendant Alford is, and at all times relevant to this Complaint was, the Restorative Practice Coordinator at Langley. At all times relevant to this Complaint, Defendant Alford was designated by Defendant Kellogg as Langley's Bullying Point of Contact, in which capacity he was delegated the responsibility to receive and investigate reports of bullying, notify parents of those involved, document the

---

[2] D.C. Public Schools, *DCPS at a Glance: Enrollment*, https://dcps.dc.gov/node/966292 (last visited Oct. 27, 2026).

conclusions of such investigations within thirty days, and apply appropriate consequences or interventions. At all relevant times, Defendant Alford acted under color of law within the scope and course of his employment by the District.

22. Defendant Nicole Jennings is sued in her individual capacity. Defendant Jennings is, and at all times relevant to this Complaint was, the In School Suspension Coordinator at Langley. At all times relevant to this Complaint, Defendant Jennings was designated by Defendant Kellogg as a bullying prevention specialist at Langley, in which capacity she was delegated the authority to impose consequences (including discipline against students who engaged in bullying or harassing conduct) or make interventions in response to reports of bullying and harassment, including creating a written record of any disciplinary actions or other interventions made in response to such incidents. At all times relevant to the Complaint, Defendant Jennings acted under color of law within the scope and course of her employment by the District.

**JURISDICTION AND VENUE**

23. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343(a).

24. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

25. This Court is authorized to order declaratory relief under 28 U.S.C. § 2201 and 2202.

26. Venue is proper in the District Court for the District of Columbia under 28 U.S.C. § 1391(b) because Defendant District of Columbia resides in this District, the claims arose in the District, and the events giving rise to this action occurred in the District.

## STATEMENT OF FACTS

***Plaintiff, an Asian Student of Uzbek Descent, Was Part of a Small Minority at Langley Elementary School***

27. Plaintiff is of Uzbek national origin. Uzbeks are Central Asian and an ethnic minority group in the United States. In 2023, Asian people made up approximately 7% of the total population of the United States.[3] Persons of Uzbek descent account for approximately 0.2% of the United States' Asian population.[4]

28. In 2025, Asian people accounted for approximately 5.8% of the total population of D.C.[5] Persons of Uzbek descent account for approximately 0.02% of the total population of D.C.[6]

29. DCPS serves approximately 52,000 students in Pre-K 3 through 12th grade.[7] From 2017 to 2024, Asian students accounted for approximately 2% percent of all students at enrolled at DCPS.[8]

30. During the 2023-2024 school year, approximately 348 students were enrolled at Langley, a public elementary school in DCPS serving grades Pre-K 3 through 5th grade.[9] That year, only 3% of Langley students, or approximately ten students, were Asian.[10] Upon information

---

[3] Carolyne Im, *Facts about Asians in the U.S.*, Pew Rsch. Ctr. (May 1, 2025), https://www.pewresearch.org/race-and-ethnicity/fact-sheet/asian-americans-in-the-u-s/.

[4] Carolyne Im, *Facts About Uzbeks in the U.S.*, Pew Rsch. Ctr. (May 1, 2025), https://www.pewresearch.org/race-and-ethnicity/fact-sheet/asian-americans-uzbeks-in-the-u-s/.

[5] U.S. Census Bureau, *QuickFacts: District of Columbia* (July 1, 2025), https://www.census.gov/quickfacts/DC.

[6] Neilsberg, *Uzbek Population in United States by Metro Area: 2026 Ranking & Insights*, Neilsberg Rsch. (Oct. 13, 2026), https://www.neilsberg.com/insights/lists/uzbek-population-in-united-states-by-metro-area/.

[7] D.C. Public Schools, *supra* note 2.

[8] *Id.*

[9] *Langley Elementary School*, My Sch. DC, https://web.archive.org/web/20250316213503/https://www.myschooldc.org/schools/profile/60 (archived Mar. 16, 2025).

[10] *Id.*

and belief, Plaintiff was the only student of Uzbek national origin at the school while she was enrolled there.

31. In a recent study, 9% of Asian students aged twelve to eighteen reported being bullied at school.[11] Almost 7% of those who reported being bullied also reported that they thought the bullying was related to their race.[12] Since the COVID-19 pandemic, there has been a rise in anti-Asian bullying and harassment, both inside and outside of the classroom.[13]

***Laila Was Targeted with Severe, Persistent, and Pervasive Peer-on-Peer Discriminatory Harassment as a Fourth Grader at Langley***

32. Laila enrolled at Langley in 2017 in the school's Pre-K 3 program, an early childhood education program for children who are residents of the District of Columbia and three years old as of September 30 of their year of enrollment.

33. Laila attended school at Langley until 2024, when she was in the fourth grade.

34. Throughout her time as a student at Langley, Laila was one of only a small number of Asian students at the school and often the only Asian student in her class.

35. For her first several years at Langley, Laila was happy at school and had many friends.

36. By third grade, however, Laila began experiencing bullying and harassment from other students, targeting her for being Asian. That harassment escalated and continued in the fourth grade.

---

[11] Véronique Irwin et al., *Report on Indicators of School Crime and Safety: 2023*, Inst. of Ed. Scis. 8 (July 2024), https://nces.ed.gov/pubs2024/2024145.pdf.

[12] Digest of Education Statistics 2023, tbl. 230.35, *Percentage of students ages 12-18 who reported being called hate-related words at school, by type of hate-related word and selected student and school characteristics: School year 2021-22*, https://nces.ed.gov/programs/digest/d23/tabLangley/dt23_230.35.asp (last visited Oct. 27, 2026).

[13] J. Yu et al., *Building Support for Asian American Youth through the Pandemic and Beyond*, StopBullying.gov (May 10, 2022), https://www.stopbullying.gov/blog/2022/05/10/building-support-asian-american-youth-through-pandemic-and-beyond.

37. In August 2023, Laila returned to Langley for the fourth grade. A newly enrolled Langley student ("Student A") immediately began harassing Laila, by calling her anti-Asian racial slurs, making "slanted eye" gestures, taunting her in made-up "Chinese," and mocking her for being Asian. Student A is not Asian or Uzbek.

38. During recess and break times, Student A repeatedly called Laila anti-Asian racial slurs and told Laila that she was ugly because "Asians are disgusting and ugly." During some of these incidents, Student A physically assaulted Laila, stepping on the back of her shoes and tripping her repeatedly.

39. In August 2023, as Student A's harassment continued, Laila began suffering from insomnia on nights before school. Many mornings before school, she experienced anxiety, sudden headaches, severe stomach aches, and severe panic attacks out of fear of facing further harassment at school that day. She did not experience any of the same symptoms on weekends when she did not need to go to school.

40. Around that same time, Laila developed and exhibited worsening self-esteem. She criticized her own Asian-appearing facial features and called herself "ugly" and "disgusting." She told her mother that she wished she looked different and resembled the "normal kids" at school. Her mother, Ms. Loe, became increasingly concerned by this sudden change in Laila's self-image and happiness. At the time, Laila had not yet shared with her mother that she was experiencing anti-Asian harassment at school.

41. Student A's harassment of Laila continued unchecked. On October 24, 2023, Laila's homeroom teacher, Samantha Mahoney, witnessed Student A attempting to trip Laila by stepping on the back of her shoes. Ms. Mahoney pulled the students aside and Student A admitted to using

racial slurs against Laila. Ms. Mahoney asked both students to talk about their feelings and apologize to each other.

42. Student A's racial harassment of Laila continued and worsened, and other classmates joined him, making Laila's life miserable. Over the next several days, students whom Laila had previously considered her friends began joining Student A in harassing and denigrating Laila because of her race and national origin. An increasing number of her classmates began repeating the racial slurs Student A had been using since August, making "slanted eye" gestures, taunting her in made-up "Chinese," and mocking her for being Asian. Laila became alienated and ostracized at school. She continued to experience panic attacks, trouble sleeping, loss of appetite, unexplained stomach aches, and constant anxiety.

43. The harassment extended from recess and breaktimes to other classes and occurred multiple times throughout the school day, every single day. It also began to occur outside of school. For example, when Laila was at home playing video games online with some of her classmates whom she had considered friends, they began to send her messages calling her anti-Asian slurs.

44. After school, on October 26, 2023, Laila told her mother about the bullying and harassment she had been experiencing at Langley. Laila stated that there were multiple classmates involved, including Student A, recounting the verbal, physical, and online harassment she had been experiencing. Ms. Loe was shocked to learn that her daughter's recent physical and mental symptoms had been caused by bullying and harassment at school.

***Defendants Failed to Properly Investigate or Meaningfully Respond the Multiple Reports of Racial Harassment Against Laila Throughout Her Fourth-Grade Year***

45. On October 27, 2023, Ms. Loe sent an email to Ms. Mahoney stating that she had just learned that Student A was subjecting Laila to discriminatory, anti-Asian harassment. Ms. Loe reported that the continuous harassment included racial slurs such as "Ching Chong," involved

telling Laila that "Asians are ugly," and became physical when Student A repeatedly attempted to trip Laila.

46. On October 27, 2023, Ms. Mahoney responded to the email and stated that she was aware of one incident on October 24, 2023, and had spoken to the students involved. Ms. Mahoney also stated that she had reported the incident to Defendants Alford and Jennings, who were beginning an investigation into the matter and would reach out for more information. Ms. Mahoney stated that she and Laila's other homeroom teacher would ensure Laila's comfort in their classroom.

47. As is required under District of Columbia law, DCPS maintains a policy preventing bullying, *DCPS District-Wide Bullying Prevention Policy* ("Bullying Policy").[14] The Bullying Policy was adopted for the express purpose of addressing race-based bullying. It defines bullying as any severe, pervasive, or persistent act or conduct, whether physical, electronic, or verbal, that is based on a student's actual or perceived race (or other protected categories) and is reasonably predicted to place a student in fear of physical harm; detrimentally effect the student's physical or mental health; interfere with the student's performance, attendance, or ability to participate in school; or materially disrupt the education process. Bullying Policy at 6. The Bullying Policy requires that each school principal respond to and investigate complaints of bullying, as defined by the Policy, or designate another school official to do so, and specifies that the grievance procedures for bullying reports also apply to suspected violations of federal civil rights laws, including Title VI. *Id.* at 11-13, 19, 26.

[14] D.C. Public Schools, *DCPS District-Wide Bullying Prevention Policy* (Nov. 2013), https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/DCPS%20Bullying%20Prevention%20Policy.pdf.

48. At the time of the relevant events, Defendant Kellogg had delegated the authority to investigate and respond to bullying reports to Defendants Alford and Jennings. Teachers and staff at Langley were required to report bullying and harassing conduct to Defendant Alford or Defendant Jennings. In turn, Defendants Alford and Jennings were required to report an allegation of bullying to the parents of all involved students, initiate an investigation into the allegations within one day after receiving a report, conclude their investigation no more than thirty days after the report, and create a written record of the incident. If they ultimately determined that bullying did occur, Defendants Alford and Jennings were required to apply consequences or interventions to prevent further bullying, such as designating a "safe" staff member to support the victim, altering the class schedule of the students involved, providing sensitivity training to the student accused of bullying, or suspending the perpetrating student.

49. Ms. Loe had previously been told that Defendant Alford was the school's bullying prevention specialist when, sometime during Laila's third-grade year, she was called racial names by a student. Ms. Loe reported this incident to Laila's third-grade teachers, who assured her that they had informed Defendant Alford of the incident, and that he would investigate the matter. Ms. Loe did not hear more from the school but had assumed that the matter had been resolved internally.

50. After she sent her email on October 27, 2023, Ms. Loe received a phone call from Defendant Alford, who stated that he would continue the investigation and let Ms. Loe know the outcome. Ms. Loe never received a report about the incident, nor did she receive an official response regarding the outcome of the purported investigation.

51. Many weeks after Ms. Loe reported the October 2023 incident, Defendant Alford told Ms. Loe "off the record" that he had called the offending student's parents and told them about

the racial harassment, to which they responded "so what?" Defendant Alford stated that there was nothing further he or anyone at else at Langley could do. He did not reference the wealth of other options (such as placing the bullying student on a Behavior Incentive Plan) outlined by the Bullying Policy and Langley Student Handbook.

52. Laila continued to face racial harassment at school and her mental health continued to decline.

53. On December 4, 2023, Laila was in art class when another student ("Student B") began mocking her by making "slant-eye" gestures and calling her anti-Asian slurs. Other students laughed as Student B berated Laila with other anti-Asian racial insults.

54. The art teacher, Marka Johnson, witnessed the incident and sent Student B out of the classroom to speak with Defendant Jennings.

55. Defendant Jennings then brought Laila into the hallway to speak to Student B, who apologized. Defendant Jennings then looked directly at Laila, and Laila felt compelled to say that she forgave Student B, so she did.

56. At around 5:00 p.m. on December 4, Ms. Johnson called Ms. Loe, informed her of the incident, and told her she was extremely concerned about the discriminatory behavior she had witnessed in her class.

57. At around 5:20 p.m. on December 4, Ms. Loe picked up a devastated Laila from school. Laila told her mother that she hated being an "ugly Asian" and wished that she would die and be born another race.

58. Ms. Loe encouraged Laila to send an email reporting the incident and the unsatisfactory response to her homeroom teacher, Ms. Mahoney. Laila did so, describing the

incident and explaining that she felt forced to forgive Student B despite knowing that she had been treated "very badly" and "felt very hurt."

59. Despite the requirements of the Bullying Policy, Defendants failed to begin an investigation into this grievance or to further communicate with Laila or Ms. Loe in any way. Defendant Jennings never offered written conclusions or records of the incident to Ms. Loe.

60. The discriminatory harassment of Laila continued, spreading to students outside the fourth grade. Students throughout the school called Laila racial slurs, spoke to her in made-up "Chinese," and made "slant-eye" gestures.

61. Laila's physical and mental health continued to decline. Her pediatrician diagnosed her with anxiety. She began to experience extreme depression and lose weight. Ms. Loe was frightened by Laila's weight loss, since she was already a small child.

62. Laila again told her mother that she wished to die in her sleep and never wake up. She also repeatedly told her mother that "ugly" and "disgusting' children like her should not live.

63. In December 2023, school adjourned for winter break. During the break, Laila's mental health greatly improved. But when she returned to school in January 2024, her insomnia, morning panic attacks, and other symptoms quickly resumed.

64. On January 25, 2024, another student ("Student C") called Laila anti-Asian racial slurs. That same day, a different student ("Student D") made racist remarks to Laila. When Ms. Loe picked Laila from school, Laila burst into tears and again told Ms. Loe that she did not feel safe going to school and wished she was dead. Ms. Loe reassured her that school staff was investigating and that there would soon be consequences for the bullies. She told her daughter that Langley staff and teachers cared about her and would protect her.

65. On January 27, 2024, Ms. Loe sent an email to Ms. Mahoney and the Individual Defendants detailing the anti-Asian harassment that Laila had experienced at school two days earlier. In her email, Ms. Loe asked:

> When is this going to end?? What are you (collectively with your team of trained specialists) doing to prevent this racist contagion? What does it take to stop this disgusting racist targeting and bullying once and for all? Do I need to involve other agencies? Do I need to report these incidents to the media? Post on social media to raise awareness on what's going on at Langley and ask for help? Please advise me on what I should do to protect my child against racist attacks while she is at school.

66. In that same email, Ms. Loe expressed that Laila did not feel safe going to school and was talking about wanting to die. Ms. Loe asked them to send copies of the past investigation reports involving Laila and asked if she was required to make a public records request to obtain them.

67. On January 28, 2024, Defendant Alford responded to Ms. Loe's email and stated that Laila had informed her science teacher, Ms. Kubleck, about the incident on January 25, 2024. Defendant Alford stated that he or another colleague would "gather the student's [sic] involved and address the issue." He also stated that he would "follow up" with Ms. Loe with the findings of the investigation and the "plan of action moving forward."

68. Defendant Alford never followed up with Ms. Loe or created a plan of action, in violation of the Bullying Policy. He also never provided the investigation reports to Ms. Loe, also in violation of the Bullying Policy.

69. DCPS also maintains a grievance policy, *Response to Grievances Filed by Students and the General Public* ("Grievance Policy")[15], which defines a "Civil rights grievance" as "any report or claim alleging a violation of […] Title VI […] the D.C. Human Rights Act, or any right

[15] D.C. Public Schools, *Response to Grievances Filed by Students and the General Public* (Oct. 1, 2021), https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/Response-to-Grievances-Filed-by-Students-and-the-General-Public.pdf.

stipulated in the *Anti-Discrimination Policy: Students* and the *Preventing and Addressing Student-on-Student Sexual Misconduct Policy*," and states that grievances reported verbally or in writing to any school staff member "alleging a civil rights allegation must be reported to the [DCPS] CARE Team." Grievance Policy at 2-4.

70. Langley violated the Grievance Policy by failing to report Ms. Loe's emailed complaints, which clearly detail civil rights grievances, to the DCPS CARE team.

71. Ms. Loe never received another response to her email from Defendants Kellogg, Alford, or Jennings or anyone else at Langley for the remainder of Laila's time as a Langley student.

72. Throughout January and February 2024, the peer-on-peer racial harassment of Laila continued, and no corrective measures were taken. With no intervention from school officials, Laila continued to experience daily anxiety and distress, as well as suicidal ideation, because of the discriminatory harassment and racial mockery she faced at school.

73. On February 21, 2024, Student A once again racially taunted Laila. Ms. Mahoney relayed this to another teacher in a text message. The school never investigated this incident. Ms. Loe was never notified of this incident by the school and only learned of it many months later from Laila.

74. On March 18, 2024, Student A verbally harassed Laila again, telling her repeatedly that she "looks like a stripper." Laila was devastated and told her mother that she does not feel safe around Student A.

75. That afternoon, Ms. Loe emailed Ms. Mahoney and the Individual Defendants, asking if they were aware of the incident. Ms. Loe requested that the administration organize a meeting between Ms. Loe and Student A's parents. None of the recipients responded to this email.

76. The same evening, Ms. Loe again emailed Defendant Kellogg and copied other staff at Langley, including a school social worker, Rebecca Henricks. Ms. Loe requested a meeting with Defendant Kellogg to discuss withdrawing Laila from Langley due to the "hostile and unsafe environment" at the school which had "extremely negatively affected her mental health and emotional wellbeing." The email detailed the insomnia, nightmares, anxiety-induced headaches, stomach aches, and panic attacks that Laila was experiencing. Ms. Loe explained that she has been documenting each incident and that it "unfortunately looks like there is not much you can or [are] willing to do as a principal of the school." Ms. Loe wrote that she was aware of many stories where victims of harassment committed suicide because the adults tasked with protecting them failed to intervene. Ms. Loe concluded by saying "[a]s long as I am alive, [Laila] will not be another sad statistic."

77. Two days later, on March 20, 2024, Defendant Kellogg responded and thanked Ms. Loe for sharing her concerns. Defendant Kellogg stated that she understood Ms. Loe's frustration and would be amenable to scheduling a meeting.

***Defendant Kellogg Dismissed the Chronic Racial Harassment of Laila as "Kids Just Being Kids" and Refuses to Intervene***

78. On March 25, 2024, Defendant Kellogg and Ms. Loe had an in-person meeting. During the meeting, Defendant Kellogg refused to acknowledge that there was any discriminatory harassment happening at Langley. Defendant Kellogg told Ms. Loe that the school encourages students not to use "unkind words" but that she was unable to control all of the students. She said that she could not raise the "three hundred-something" students herself. Defendant Kellogg then said words to the effect of "the kids are just being kids."

79. Ms. Loe explained that the harassment Laila faced from her peers was not merely "unkind words," but outright racial harassment. It became increasingly clear to Ms. Loe that Defendant Kellogg was indifferent to the discriminatory anti-Asian harassment faced by Laila.

80. Ms. Loe stated that she might need to pull Laila out of Langley for the sake of her mental health if the harassment were not addressed. Defendant Kellogg responded by telling Ms. Loe that the decision was hers to make. Defendant Kellogg made no mention of the procedures enumerated in the Bullying and Grievance Policies that the school was required to follow, or any other supportive measures, all of which might have allowed Laila to remain at Langley and attend school safely. Defendants never disciplined the students who bullied Laila, properly investigated reports of harassment, provided Laila with a "safe" staff member as support, instituted other supportive measures, or, indeed, took any measures to stop the harassment and redress the racially hostile environment to which Laila had been subjected.

81. Prior to this March 25, 2024 meeting with Defendant Kellogg, Ms. Loe had believed that Langley was actively investigating the harassment internally. At the meeting, it became clear that Defendants Kellogg, Alford, and Jennings and other Langley staff were not protecting Laila despite having been on notice of the discriminatory harassment and its impact on Laila's mental health for many months. Ms. Loe realized that her trust had been misplaced.

82. In an attempt to resolve the issue on her own, Ms. Loe requested Defendant Kellogg's assistance in setting up an in-person meeting with the parents of the students accused of harassment. Ms. Loe repeatedly offered times when she would be able to request time off work and have a sit-down discussion with the parents. Ms. Loe hoped that having a discussion with the parents of Laila's bullies could lead to some resolution, but Defendant Kellogg never set up such a meeting.

***Langley Social Worker Asked Laila if She Was Suicidal But Offered No Support***

83. On April 4, 2024, the school social worker, Ms. Henricks, pulled Laila aside and asked her if she was suicidal and if she had tried to kill herself in January. Ms. Hendricks was presumably referring to Ms. Loe's reference to the suicide risk that accompanies student harassment in her March 18, 2024 email, on which Ms. Henricks was copied. Ms. Hendricks concluded during the conversation that Laila was not suicidal and allowed Laila to return to recess. She did not offer Laila any help or share any mental health resources that were available. She also did not contact Ms. Loe or inform her about this discussion, either before or after it happened.

84. Laila was extremely distressed by this conversation and told her mother what had occurred. Laila was upset that her mother had reported information about suicidality, and told her mother that she hated her and hated herself for being born. Ms. Loe emailed Ms. Hendricks and copied Defendant Kellogg inquiring whether Ms. Hendricks had asked the question of Laila. Ms. Loe asked about the context of the conversation and asked if Ms. Hendricks had offered Laila any help or resources. Ms. Loe told Ms. Hendricks that Laila was "extremely worried now about the stigma of [being] a suicidal person." Ms. Loe further asked why Ms. Hedricks had waited eighteen days to respond to her March 18 email and why she talked to Laila instead of responding to Ms. Loe directly. Neither Ms. Hendricks nor Defendant Kellogg ever responded to this email.

***Ms. Loe Was Forced to Withdraw Laila from Langley to Protect Her from Further Harassment***

85. On April 12, 2024, in the face of continued inaction by Langley administrators and staff, and fearing for Laila's safety and mental health, Ms. Loe told Laila she no longer needed to attend Langley and began making emergency plans to homeschool her for the remainder of the school year. Ms. Loe asked Defendant Kellogg if there were any resources available to assist in

homeschooling Laila. Defendant Kellogg stated that none were available and, again, failed to suggest any measures that would allow Laila to remain safely at Langley.

86. On April 23, 2024, Ms. Loe formally withdrew Laila from Langley. On the withdrawal form, Ms. Loe cited "bullying, racist harassment, [and] safety concerns" as the basis for the withdrawal.

87. In April 2024, Ms. Loe filed a complaint with the District of Columbia State Board of Education, which in turn contacted the District's Youth Bullying Prevention Program, a program of the DC Office of Human Rights ("OHR"). OHR has statutory authority to investigate complaints that the District's Youth Bullying Prevention Act has been violated.

***After Plaintiff's Withdrawal, the D.C. Office of Human Rights Investigated and Concluded That Defendants' Response to the Harassment of Plaintiff Was Unsatisfactory***

88. On April 29, 2024, Ms. Loe received a call from Tenia Pritchard, the DCPS Instructional Superintendent for Cluster Three schools, which includes Langley. Dr. Pritchard stated that she had spoken with Defendant Kellogg, who had informed her that the harassment issue was "resolved." Dr. Pritchard stated that Defendant Kellogg informed her that the only unresolved issue was an in-person meeting between Ms. Loe and the parents of Student A. Dr. Pritchard then told Ms. Loe that the parents of Student A were not obligated to meet with her if they did not want to.

89. Ms. Loe informed Dr. Pritchard that the racial harassment issue was not "resolved" and that she was astonished to hear that Defendant Kellogg had said it was. Ms. Loe requested another meeting with Defendant Kellogg. Dr. Pritchard scheduled a meeting for May 3, 2024.

90. The same day, April 29, 2024, Ernest Shepard, a Youth Bully Prevention Program Manager from OHR, emailed Defendants Kellogg and Alford to report that a complaint had been filed stating that Laila had experienced racially motivated harassment and discrimination and that

Langley demonstrated "a lack of urgency in addressing and resolving the issue." The email further stated that it appeared that the school had failed to provide the results of the bullying investigations to Ms. Loe and that Laila was "not offered concrete supportive measures in response to the alleged behaviors towards them," leading to severe mental health issues for Laila. Mr. Shepard requested a meeting with Defendants Kellogg and Alford. Mr. Shepard received no response to this email.

91. On May 2, 2024, Mr. Shepard sent a follow-up email flagging that OHR had not received a response from Defendants Kellogg or Alford. He received no response to this second email either.

92. On May 2, 2024, in preparation for the May 3, 2024 meeting that Superintendent Pritchard had scheduled, Ms. Loe sent an email to DCPS CARE detailing the incidents of racially discriminatory harassment faced by Laila dating back to October 26, 2023. Despite Laila and Ms. Loe's previous complaints to teachers and school officials, this was the first notice of the racial discrimination received by the DCPS CARE Team about Laila. Defendants' previous failure to report these incidents to the DCPS CARE Team violated their obligations under the Grievance Policy.

93. On May 3, 2024, Ms. Loe attended the meeting with Defendant Kellogg that Dr. Pritchard had scheduled. Ms. Loe was surprised to find four other individuals present for the meeting: Jamie Little, a Restorative Practices Specialist for Cluster Two and Three Schools; Ronald Perry, a Title IX Coordinator with the DCPS CARE Team; Renatta Landrau, Student Advocate from the State Board of Education; and Mr. Shepard from OHR.

94. During the May 3 meeting, Mr. Perry stated that the reason that the DCPS CARE Team did not previously open an investigation into the matter was because race was not mentioned in the report that he received from the Langley administration about harassment. Mr. Perry stated

that the school administration's report was incomplete and omitted information about race and the severity of the harassment. He further stated that now that he had accurate information, he would open a DCPS CARE investigation into the harassment.

95. During the May 3 meeting, Ms. Little stated that Langley had under-reported the incidents of racial bullying as Tier I infractions instead of Tier III infractions. DCPS's *Safe and Positive Schools Policy* ("Disciplinary Policy")[16] creates a four-tier system of behaviors, increasing in severity from Tier I to Tier IV. Tier I behaviors, which Langley purportedly used to categorize Laila's harassment, are the least severe and are "insubordinate or cause minor disruptions to the academic environment but do not involve […] harm to self or others." *Id.* at 17. They often result in "classroom-level disciplinary responses." *Id.* In contrast, Tier III behaviors cause "significant disruption the academic environment or cause harm to self or others" and explicitly include race- or national origin-based bullying. *Id.* at 19.

96. According to Ms. Little, the DCPS CARE Team does not have authority over Tier I infractions but does investigate Tier III infractions. Ms. Little explained that, had the Langley administration properly reported the incidents, the DCPS CARE Team would have gotten involved immediately. This improper categorization indicates the District's failure to train on the Disciplinary Policy.

97. During the May 3 meeting, Ms. Landrau asked Defendant Kellogg whether a situation where a white student uses a slur against a Black student and a situation where a Black student uses a slur against an Asian student should be treated the same. Upon information and belief, Defendant Kellogg was silent and did not respond.

[16] D.C. Public Schools, *Safe and Positive Schools Policy* (Feb. 2, 2023), https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/Safe%20%26%20Positive%20Schools%20Policy_FINAL_2.2.23.pdf.

98. During the May 3 meeting, Defendant Kellogg apologized to Ms. Loe and promised to send her copies of Langley' incident reports. Ms. Landrau also requested copies of the incident reports. Superintendent Pritchard and Defendant Kellogg stated that they had the reports but needed time to redact students' information before releasing them.

99. The DCPS attendees confirmed in that meeting that no appropriate disciplinary or remedial measures had been taken in response to the discriminatory harassment Laila had experienced. Despite the Disciplinary Policy's guidelines, none of the students who bullied Laila had faced consequences or been placed on Behavior Improvement Plans, which are used for Tier III infractions.

100. On May 6, 2024, Ms. Loe had another meeting with Ms. Landau and Mr. Shepard from the Youth Bullying Prevention Program. Mr. Shepard stated that Langley "needs training" and did not "follow proper steps." Mr. Shepard also stated that he was alarmed that Ms. Loe had never received official findings of bullying investigations, as this deprived her of an opportunity to appeal.

101. Ms. Landau repeated that Ms. Loe should have received the incident reports within thirty days, as required in the Bullying Policy. Ms. Landau further stated that she was confused by Defendant Kellogg's response that the reports could not be released because they were not redacted, as it appeared to Ms. Landau from the May 3 conversation that the reports had never been written. Mr. Shepard then stated that he would be referring Defendant Kellogg to DCPS's Office of Integrity, which addresses complaints and concerns about DCPS employees and other issues.

102. On May 8, 2024, DCPS formally notified Ms. Loe that the allegations of racial discrimination would be investigated by DCPS CARE Team.

### *OHR Found Defendants Failed to Comply with the Youth Bullying Prevention Act's Protections Against Bias-Motivated Harassment*

103. On May 17, 2024, OHR issued Defendant Kellogg a Notice of Non-Compliance with the Youth Bullying Prevention Act of 2012 (the "Notice"), which detailed the history of racial harassment directed at Laila while she was a student at Langley and the lack of response by Langley administrators and staff despite actual notice of the harassment.

104. The Notice stated that Langley failed to follow the proper procedures outlined in the Youth Bullying Prevention Act and the DCPS Bullying Policy.

105. The Notice also stated that the failure to provide Ms. Loe with any results from the investigations between October 27, 2023, and May 3, 2024, went "well beyond the requirement of 30 days" and that the school made "no effort to provide the parents with information they had the right to receive."

106. The Notice also stated that it was unclear if the additional allegations made on January 27, 2024, and March 18, 2024, were *ever* investigated and that, even if they were, Langley had failed to provide Ms. Loe with the results of these investigations.

107. The Notice also stated that Langley failed to properly identify the alleged behavior as "race-based," failed to report the harassment as Tier III incidents, and failed to notify the DCPS CARE Team so that they could investigate the discrimination. OHR also stated that Langley failed to communicate "any support or interim measures to assist with Student [Laila Loe's] mental health."

108. On May 22, 2024, Ms. Loe spoke on the phone with DCPS CARE Team representative Kintora Chapman. When Ms. Loe expressed regret for not filing a complaint with DCPS CARE earlier, Ms. Chapman stated that most parents and "to be honest teachers" do not know about the DCPS CARE team, but that the principals and assistant principals are aware. Ms.

Chapman also stated that if the incidents had been reported accurately, DCPS CARE would have gotten notice much sooner. Ms. Chapman stated words to the effect of "this was on the school" and that the school "failed" Laila and Ms. Loe.

109. On May 23, 2024, DCPS CARE presented the Langley administration with "civil rights training" which included "proper response protocol."

***Only After OHR's Findings, Defendants Belatedly Provided Three Post-Dated Incident Reports to Ms. Loe***

110. On May 30, 2024, Langley finally shared three bullying incident reports with Ms. Loe for incidents dated October 24, 2023; February 21, 2024; and March 18, 2024. Despite previous claims by Defendant Kellogg and Dr. Pritchard that the reports had been completed within thirty days, as required by the Bullying Policy, the provided reports all recorded the "Date Incident Reported" as May 8, 2024, the day that DCPS CARE informed Defendant Kellogg that it would be opening an investigation into the incidents.

111. The bullying incident reports uniformly and incorrectly state that all incidents took place at 2:00 p.m. and falsely state that "Admin along with parents and DCPS were notified."

112. The bullying report for February 21, 2024, appears to be an amalgamation of other incidents that took place starting in October 2023 rather than a single, discrete incident.

113. Langley failed to provide any reports on the many other harassment incidents, including the incidents on December 4, 2023, and January 25, 2024, which Ms. Loe reported directly to Langley staff and administrators.

114. When Ms. Loe inquired about the May 8 date on the reports, a DCPS CARE representative stated that it did not make sense, and that the Langley administration was "not taking these incidents seriously" and "dropped the ball."

***DCPS CARE Team Issued Findings of Investigation, Concluding That Plaintiff Was Likely Harassed by Student A Because of Her Race***

115. On July 26, 2024, the DCPS CARE Team sent Ms. Loe the findings of their investigation. The findings stated that DCPS CARE found it "more likely than not that [Student A] harassed Student [Laila] on the basis of race." DCPS CARE came to this conclusion based on information obtained from Ms. Loe, interviews with Student A, and the "negative impact to Student [Laila's] wellbeing as evidence by their desire to no longer attend school."

116. The DCPS CARE Team also investigated misconduct by Langley administrators and staff for failing to properly report student incidents involving bullying, harassment, and racial discrimination. The DCPS CARE letter stated that "despite the parent of Student [Laila] reporting the incidents to the school beginning in October of 2023, the DCPS CARE Team was not properly notified of the incidents until May 2, 2024," in violation of DCPS' Grievance Policy.

117. The DCPS Care Team concluded that it was "more likely than not [that] the Langley administration failed to follow the proper protocol for reported grievances." The report stated that a referral to the DCPS Office of Labor Management and Employee Relations was made for failure to report by the Langley administration.

118. Notwithstanding that report, Defendants Kellogg, Alford, and Jennings remain employed by DCPS. In June 2026, Kellogg transferred to Horace Mann Elementary School, another DCPS school, where she is Assistant Principal. Defendants Alford and Jennings are still employed at Langley. They continue to serve as the school's bullying prevention specialists.

119. On March 21, 2025, Ms. Loe filed a discrimination complaint with OHR, alleging that Defendants violated the D.C. Human Rights Act's prohibition on race and national origin discrimination by educational institutions. On October 27, 2026, Ms. Loe withdrew her complaint with OHR in anticipation of filing this lawsuit.

***The Discriminatory Harassment Has Had a Lasting Impact on Laila and Her Family***

120. When Laila attended Langley and for some time after she withdrew, she and Ms. Loe lived across the street from the school. Following her withdrawal, seeing the school every day caused severe stress to both of them. Laila could hear children playing during recess, which caused her to experience anxiety and distress because recess was a time during which Laila had experienced frequent and extreme harassment. To avoid this trigger, Ms. Loe moved the family elsewhere.

121. Following Laila's withdrawal from Langley in April 2024, she missed her first three weeks at the school she intended to transfer to, Key Elementary, due to severe panic attacks triggered by her fear of experiencing racism at another DCPS school.

122. Ms. Loe is an immigrant to the United States, a survivor of domestic violence, and a single mother. From 2020 to 2023, Ms. Loe underwent a costly immigration process to acquire permanent resident status for her parents. Ms. Loe believed that having family in the country would benefit Laila and provide childcare to allow Ms. Loe's career to thrive. Her mother and father immigrated to the United States in 2020 and 2023, respectively.

123. From 2023 to 2024, Ms. Loe's parents witnessed the harmful impact the racial harassment had on Laila's mental and physical health. After witnessing Laila refuse to eat for five days following her removal from school, Ms. Loe's parents told her that Laila needed to leave the toxic environment and insisted on taking her to live in Uzbekistan. Laila was then taken to Uzbekistan by her grandparents, despite having been born in the United States, only having visited there once as a baby, and not speaking any Uzbek or Russian.

124. While relocation to Uzbekistan was intended to be a short-term solution, after her arrival, Laila informed Ms. Loe that she wished to remain. She told her mother that in Uzbekistan,

she feels accepted. Laila informed Ms. Loe that it is where she feels "normal" and that she no longer sees herself as an "ugly, disgusting Ching Chong."

125. Laila, a U.S. citizen, now resides in Uzbekistan with her grandparents. She attended a private school but now attends a public Russian school. Ms. Loe has been paying for Laila's tuition and other living expenses in Uzbekistan, as well as her parents' expenses. To do so, Ms. Loe has forgone the basics for herself, and has been distressed by her inability to see her child for over two and half years.

126. Laila often calls Ms. Loe crying because she misses her mom but does not want to come back to the United States, which she associates with the traumatizing harassment she suffered at Langley. Meanwhile, Ms. Loe cannot relocate to Uzbekistan because her work is in the United States and because of travel restrictions. Ms. Loe feels immeasurable pain because she is unable to nurture her child during her formative years and missing countless precious moments and milestones. Laila has not seen, held, or hugged her mother in more than two years.

**INJURIES TO PLAINTIFF**

127. Defendants, through their actions described herein, denied Laila full and equal access to DCPS's education programs and activities.

128. As a direct and proximate result of Defendants' unlawful actions, Laila has experienced and continues to experience the harmful effects of being treated differently than her non-Asian classmates at school, including severe emotional distress, humiliation, embarrassment, social isolation, stigma, Post Traumatic Stress Disorder (PTSD), and physical health issues.

129. Defendants' discriminatory actions have caused Laila to lose educational opportunities, including lost class time and missed school due to the adverse physical and emotional health effects related to her inability to attend school without facing severe

discriminatory harassment, and ultimately forced her to withdraw from Langley and move out of the United States to find an educational environment in which she feels safe.

130. Defendants' discriminatory actions have caused Laila to lose future economic opportunities, including future career opportunities and earnings.

131. Defendants' conduct described in this Complaint was willful, intentional, and knowing, and made with callous and reckless disregard for Plaintiff's known civil rights under federal and District of Columbia law.

## CAUSES OF ACTION

## COUNT I

### Race and National Origin Discrimination in Violation of Title VI of Civil Rights Act of 1964, 42 U.S.C. § 2000d

***Against Defendant District of Columbia***

132. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

133. Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

134. As a recipient of Federal funds, the District of Columbia and its schools are subject to Title VI's prohibitions on discrimination on the basis of race and national origin in its programs and activities, including its public schools.

135. The District is liable for acting with deliberate indifference towards severe, pervasive, and objectively offensive peer-on-peer harassment based on race and national origin suffered by Plaintiff, about which it had actual notice, including by failing to stop the known harassment, prevent its recurrence, or cure the hostile educational environment it created.

136. The District of Columbia is further liable under Title VI for subjecting Plaintiff to differential treatment because of her race and national origin relative to non-Asian and non-Uzbek students, including by:

a. failing to adequately train administrators, staff, families, and students on policies designed to address and prevent discriminatory harassment in schools;

b. failing to follow standard procedures to investigate, respond to, and address the harassment that Plaintiff suffered, that it would have followed for reports of other forms of bullying and harassment targeted at other students who are not Asian or Uzbek;

c. failing to offer or provide educational accommodations and supports, such as academic supports, assignment to a "safe" or trusted faculty member, or psychological counseling, to Plaintiff after learning about the harassment, its adverse impact on her health and well-being, and her suicidal ideation related to that harassment;

d. failing to timely and accurately report the bullying as motivated by race and national origin and failing to report the discrimination to the DCPS CARE Team;

e. refusing to take any actions proposed by Plaintiff and her mother to remedy the harassment or prevent its recurrence; and

f. ignoring and dismissing Plaintiff's, Ms. Loe's, and Plaintiff's teachers' reports of the serious impact the harassment was having on Plaintiff and her mental health.

137. As a result of the District's actions and omissions complained of herein, the discriminatory race- and national origin-based harassment against Plaintiff created a hostile educational environment, depriving her of the full ability to participate in and benefit from the education programs and opportunities offered by the District while she was a student at Langley, and wholly depriving her of those programs and opportunities after Ms. Loe was compelled to withdraw Plaintiff from DCPS to protect her from further harassment and related harms.

138. Plaintiff has been injured by the District's unlawful conduct and has suffered damages as a result.

**COUNT II**

**Discrimination Based on Race and National Origin in Violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution, Pursuant to 42 U.S.C. § 1983**
***Against All Defendants***

139. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

140. Because Plaintiff is Asian and Uzbek, Defendants failed to enforce anti-harassment and anti-bullying policies in response to reports from teachers, Laila, and Ms. Loe about anti-Asian harassment that Laila was experiencing at school, treating her differently from similarly situated students in violation of the Equal Protection Clause of the Fifth Amendment.

141. Defendant Kellogg, as the Langley principal, was authorized and required to respond to and address complaints and known incidents of bullying and harassment based on race. Defendant Kellogg delegated authority to investigate and address such incidents to Defendants Alford and Jennings. As such, the Individual Defendants' discriminatory acts and omissions complained of herein, which were made under color of law, can be attributed to the District. They also subject the Individual Defendants to liability in their individual capacities.

142. Defendants are liable for acting with deliberate indifference towards severe, pervasive, and objectively offensive peer-on-peer harassment based on race and national origin suffered by Plaintiff, about which they had actual notice, including by failing to stop the known harassment, prevent its recurrence, or cure the hostile educational environment it created.

143. Defendants are further liable under the Equal Protection Clause for subjecting Plaintiff to differential treatment because of her race and national origin relative to non-Asian and non-Uzbek students, including by:

a. failing to follow standard procedures to investigate, respond to, and address the harassment that Plaintiff suffered, that it would have followed for reports of other forms of bullying and harassment targeted at other students who are not Asian or Uzbek;

b. failing to offer or provide educational accommodations and supports, such as academic supports, assignment to a "safe" or trusted faculty member, or psychological counseling, to Plaintiff after learning about the harassment, its adverse impact on her health and well-being, and her suicidal ideation related to that harassment;

c. failing to timely and accurately report the bullying as motivated by race and national origin and failing to report the discrimination to the DCPS CARE Team;

d. refusing to take any actions proposed by Plaintiff and her mother to remedy the harassment or prevent its recurrence; and

e. ignoring and dismissing Plaintiff's, Ms. Loe's, and Plaintiff's teachers' reports of the serious impact the harassment was having on Plaintiff and her mental health.

144. By failing to follow established procedures, improperly reporting the incidents, and failing to take action to address the reported discriminatory harassment, Defendants discriminated against Plaintiff on the basis of race and national origin.

145. Defendants are liable for violating Plaintiff's Fifth Amendment rights under 42 U.S.C. § 1983.

146. Plaintiff has been injured by Defendants' unlawful conduct and has suffered damages as a result.

147. Defendants' unlawful conduct complained of herein was intentional, willful, and made in reckless disregard of Plaintiff's civil rights under federal and District of Columbia law.

## COUNT III

### Failure to Train, in Violation of the Plaintiff's Constitutional And Federal Rights, Pursuant to 42 U.S.C. § 1983
***Against Defendant District of Columbia***

148. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

149. Peer-on-peer harassment based on race and national origin that a school refuses to address is a form of unlawful discrimination that violates a student's rights under the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution.

150. At all relevant times, the District had unconstitutional customs, policies, or practices of failing to properly or sufficiently train DCPS administrators, teachers, staff, students, and families regarding race and national origin discrimination and harassment against students and

regarding identifying, reporting, preventing, stopping, and remedying the effects of discrimination and harassment against Asian students.

151. The District's failure to train its administrators, teachers, staff, students and families amounted to deliberate indifference to the rights of students, with whom DCPS and the District's employees had routine and regular contact.

152. The District's failure to train DCPS administrators, teachers, staff, students and families caused Plaintiff to suffer ongoing race and national origin-based harassment in violation of her Constitutional and federal rights.

153. The District failed to adequately train DCPS administrators, teachers, staff, students, and families, and thereby failed to prohibit or discourage foreseeable anti-Asian harassment and discrimination, despite clearly established and well-known dangers of such harassment and discrimination faced by Asian students in U.S. public schools.

154. The District failed to provide such training despite the foreseeable consequences that could result from lack of instruction, including, but not limited to, harassment and discrimination, that Plaintiff experienced, and adverse effects from such harassment and discrimination, which Plaintiff also experienced.

155. The District's failure to train its administrators, teachers, staff, students, and families caused Plaintiff to suffer ongoing race and national origin-based harassment in violation of her Constitutional and federal rights. The District's training on DCPS policies was so clearly inadequate that it gives rise to a reasonable inference that the District acquiesced in and ratified the harassment. In fact, DCPS administrators, including members of the DCPS CARE Team, had actual knowledge that DCPS administrators, teachers, and staff were unaware of the policies that should be followed where race- or national origin-based harassment occurs.

156. Plaintiff has been injured by Defendants' unlawful conduct and has suffered damages as a result.

**COUNT IV**

**District of Columbia Human Rights Act, D.C. Code §§ 2–1402.41, 1402.62**
**Discrimination Based on Race and National Origin by an Educational Institution**
***Against All Defendants***

157. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

158. Under the D.C. Human Rights Act, as codified in the D.C. Code, it is an unlawful discriminatory practice for an educational instruction to "deny, restrict, or to abridge […] access to, any of its facilities, services, programs, or benefits […] wholly or partially, for discriminatory reason, based on the actual or perceived: race, color, […] national origin […] of any individual." D.C. Code § 2–1402.4(1).

159. Under the D.C. Human Rights Act, as codified in the D.C. Code, "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so." D.C. Code § 1402.62.

160. Defendants denied Plaintiff equal access to and enjoyment of established administrative procedures that would have provided consequences and remedies to the discriminatory peer-on-peer harassment Plaintiff suffered because of her race and national origin.

161. Defendants denied Plaintiff the benefits of its programs and discriminated against Plaintiff because of her race and national origin by:

a. failing to adequately train administrators, staff, families, and students on policies designed to address and prevent discriminatory harassment in schools;

b. failing to follow standard procedures to investigate, respond to, and address the harassment that Plaintiff suffered, that it would have followed for reports of other forms of bullying and harassment targeted at other students who are not Asian or Uzbek;

c. failing to properly report and investigate reports of discriminatory bullying and harassment as required by DCPS's Bullying Policy and Grievance Policy;

d. failing to offer or provide educational accommodations and supports, such as academic supports, assignment to a "safe" or trusted faculty member, or psychological counseling, to Plaintiff after learning about the harassment, its adverse impact on her health and well-being, and her suicidal ideation related to that harassment;

e. failing to timely and accurately report the bullying as motivated by race and national origin and failing to report the discrimination to the DCPS CARE Team, including failing to properly report the severity of the incidents as required under DCPS' Bullying and Disciplinary Policies by erroneously labeling racial harassment and bullying as a Tier I disciplinary offense instead of a Tier III disciplinary offense;

f. refusing to take any actions proposed by Plaintiff and her mother to remedy the harassment or prevent its recurrence;

g. ignoring and dismissing Plaintiff's, Ms. Loe's, and Plaintiff's teachers' reports of the serious impact the harassment was having on Plaintiff and her mental health; and

a. failing to respond to Plaintiff's allegations of discrimination in the same manner as it responds to allegations of discrimination by non-Asian students.

162. The District is liable for violating Plaintiff's rights under the DCHRA, D.C. Code § 2–1402.4(1).

163. Defendants Kellogg, Alford, and Jennings are liable for aiding and abetting the District's prohibited discrimination under the DCHRA, D.C. Code § 1402.62.

164. Plaintiff has been injured by Defendants' unlawful conduct and has suffered damages as a result.

165. The District's unlawful conduct complained of herein was, and continues to be, intentional, willful, and made in reckless disregard of Plaintiff's civil rights under federal and District of Columbia law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) enter a declaratory judgment that Defendants' discriminatory actions complained of herein violate Plaintiff's rights under Title VI of Civil Rights Act of 1964, 42 U.S.C. § 2000d and District of Columbia Human Rights Act, D.C. Code § 2–1402.41, and that those actions also deprive Plaintiff of her rights under the Equal Protection Clause of the Fifth Amendment to the United States Constitution to attend school free of discrimination;

(b) award compensatory damages in an amount that would fully compensate Plaintiff for the emotional distress, medical expenses, lost educational opportunities, pain and suffering, economic losses, cost of alternative school tuition and other injuries that have been caused by Defendants' conduct;

(c) award punitive damages in an amount that would deter Defendants from engaging in future conduct that would deprive Plaintiff and other students of their constitutional and civil rights;

(d) award Plaintiff nominal damages;

(e) award Plaintiff her reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and D.C. Code §§ 2–1403.13(a)(1)(E), 2–1403.16; and

(f) order such other relief as this Court deems just and equitable.

**JURY DEMAND**

Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues in this case.

DATED: October 27, 2026

Respectfully submitted,

/s/ Joseph J. Wardenski
Joseph J. Wardenski (DC Bar No. 4595120)
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Phone: (347) 913-3311
joe@wardenskilaw.com

Alyssa C. Lareau (DC Bar No. 494881)
WARDENSKI P.C.
300 New Jersey Avenue, NW, Suite 300
Washington, DC 20001
Phone: (202) 935-4224
alyssa@wardenskilaw.com

Ellora Thadaney Israni (DC Bar No. 1740904)
Yiyang Wu (DC Bar No. 1028799)
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
Phone: (202) 728-1888
eisrani@relmanlaw.com
ywu@relmanlaw.com

*Attorneys for Plaintiff*